# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE:<br><br>FYBOWIN, LLC, *et al.,*[1]<br><br>Debtors. | Case No.: 18-21803 (GLT)<br><br>Chapter 11<br>(Jointly Administered) |
| FYBOWIN, LLC, *et al.*,<br><br>Movant(s),<br><br>-vs-<br><br>No Respondent(s). | Doc. No.:<br><br>Related to Doc. No.:<br><br>Hearing Date:<br><br>Hearing Time:<br><br>Response Deadline: |

## DECLARATION OF CHRISTIAN H. FYKE IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Christian H. Fyke, declare under the penalty of perjury to the best of my knowledge, information, and belief:

1. I hold the following positions with the above-captioned debtors and debtors in possession (the "Debtors"):

    a. the member and Chief Executive Officer of Fybowin, LLC

    b. the Chief Executive Officer of Rivertowne Growth Group, LLC

    c. the Chief Executive Officer of Fybomax, Inc.

    d. the President and Chief Executive Officer of Fybo Management, Inc., and

    e. the authorized manager of Occupy Rivertowne, LLC

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Fybowin, LLC (3207); Rivertowne Growth Group, LLC (1127); Fybo Management, Inc. (4430); Fybomax, Inc. (8955); and Occupy Rivertowne, LLC (5983).

1

2. I have been involved with the Debtors since the formation of each and I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.

3. I submit this declaration (the "Declaration") in support of the chapter 11 petitions and certain motions filed in these cases.

4. Except as otherwise indicated, all of the facts in the Declaration are based upon my personal knowledge, my discussions with other members of management, and our advisors.

5. The statements contained herein are based on my understanding of the Debtors' business, records, financial affairs, and my experience and knowledge. I am over the age of 18 years and duly authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

6. The Debtors have requested certain relief in their "first day" motions ("First Day Motions") to minimize any potential effect of the filing on these chapter 11 cases on their businesses and estates. I am familiar with the contents of each First Day Motion, and I believe that the relief sought therein is necessary and in the best interests of each estate and its creditors.

**I.    General History and Background**

7. The Debtors own and operate a quality craft brewery and four (4) regional restaurants: the Rivertowne Brewery & Tasting Room located in Export, Pennsylvania (the "Brewery"); the Rivertowne Inn located in Verona, Pennsylvania ("RT Verona"); the North Huntington Pub & Grille located in North Huntington, Pennsylvania ("RT North Huntington"); the Monroeville Pour House located in Monroeville, Pennsylvania (which includes a microbrewery) ("RT Monroeville"); and Rivertowne North Shore, located in Pittsburgh, Pennsylvania between PNC Park and Heinz Field ("RT North Shore," and with the Brewery, RT

Verona, RT North Huntington and RT Monroeville, the "Establishments"). Collectively, the Debtors employ nearly one hundred and fifty (150) employees and have grown to be a staple in the communities in which they operate.

8. The Debtors' entrance into the food and beverage industry can be attributed to the acquisition of RT Verona in 2002. Starting with this single location, management sought to capitalize on an emerging craft beer market by providing its patrons with a more diverse selection of beers coupled with quality, reasonably-priced pub food.

9. As demand increased, the business expanded in 2005 with the opening of RT North Huntington. Shortly thereafter, the Debtors began to explore the possibility of developing craft beers for distribution.

10. In 2007, the Debtors opened RT Monroeville. With a microbrewery onsite, the Rivertowne Brewing brand was officially launched with the development of a product line of distinctive, quality beers. By 2012, the Debtors opened the Brewery in order to increase production to service distribution to not only the Greater Pittsburgh Region but other markets located within the Eastern part of the United States.

11. The Brewery was constructed with state of the art equipment and currently has the capacity to brew 30,000 barrels per year (with expansion capability if necessary). The Brewery likewise contains a custom tooled canning line that allows the Debtors to can and label the vast majority of their product for distribution.

12. The Debtors focus on brewing quality, craft beer using the freshest ingredients, a state of the art brewing process, and sustainable packaging to deliver an innovative and distinct craft beer experience. The Debtors are known for their production and distribution of high quality craft beers, including year-round production of Hala Kahiki, Grateful White, Jump! IPA,

Float Trip IPA, Class V IPA, Hazy Morning IPA, and the Rivertowne EZ. The Debtors currently have two (2) seasonal brew in production/distribution – the Suburban Housewife and Maxwell's Scottish Ale, the Debtors' silver medal winner at the 2014 World Beer Cup and bronze medal winner at the most recent World Beer Cup. The Debtors likewise have regular releases of specialty microbrews throughout the calendar year.

13. The Brewery sells its beer to an independent third party distributor, who in turn, sells beer to RT North Shore, RT Monroeville, RT North Huntington, and RT Verona for subsequent resale to their restaurant patrons. Canned and cased products are otherwise generally sold to consumers through an independent third party distribution chain starting with the same independent third party distributor.

14. In recent years, the craft beer market has seen increased competition. Craft brewers battle for share of distribution channels, which in turn requires breweries such as the Debtors' to continue to innovate and find additional pathways to market share.

15. It is my understanding that from 2013 through 2017, the number of craft breweries in the United States more than doubled. Competition in the marketplace has significantly increased based on my experience.

16. The Debtors experienced reduced revenues in part from an increase in competition, a decrease in market share, challenges with distribution, and a lag time to implement a Revenue Enhancement Plan (defined below).

17. Starting in 2017, the Debtors took measures to develop a strategic revenue enhancement plan (the "Revenue Enhancement Plan"), which included: (i) producing new craft brews and a rebranding program; (ii) engaging in a marketing blitz to launch their new brand portfolio, reinvigorate their client base, and attract new customers and distributors; (iii)

strengthening their sales by evaluating the current sales force and establishing incentive and accountability programs for salespersons; (iv) increasing their exposure through tasting and sampling events at local establishments; (v) partnering with well-known local establishments to create customized, craft brews; and (vi) improving the restaurant customer experience through staff retraining, menu revisions, and capital expenditures.

18. The Debtors ultimately launched the Revenue Enhancement Plan in early April of 2018 and have already seen positive results.

19. Unfortunately, the early stages of the Revenue Enhancement Plan could not yield sufficient revenue to avoid a liquidity event that necessitated the filing of these chapter 11 cases. Notwithstanding the short-term challenge, the Debtors remain confident that they will reorganize their enterprise and successfully emerge from their chapter 11 cases.

**II.    Enterprise Structure**

20. A summary of the Debtors' enterprise structure is as follows:

   a. Fybowin LLC owns and operates the assets of RT North Shore. The member of Fybowin LLC is Fybo Management, Inc.

   b. Joseph Boros and I own 100% of Fybo Management, Inc. I hold 49% of the equity interests and Joseph Boros holds the remaining 51%. Fybo Management, Inc. also owns and operates the assets of RT Verona and RT North Huntington.

   c. Joseph Boros and I likewise control 67% of the voting rights of the equity holdings in Fybomax, Inc., and 51% of the voting interests in Occupy Rivertowne, LLC. The remaining equity holdings in Fybomax, Inc. are held by Andrew Maxwell (33%), and the remaining membership interests in Occupy Rivertowne, LLC (49%) belong to more than 30 other investors.

   d. Fybomax, Inc. owns and operates the assets and inventory located in RT Monroeville and operates the assets at the Brewery. Occupy Rivertowne owns 51% of the membership interests in Rivertowne Growth Group, LLC ("RGG"), which provides marketing, maintenance, human resources, and related services to Fybomax, Inc., Fybowin LLC, and Fybo Management, Inc. (i.e., the Brewery and the restaurants). RGG also owns the brewery equipment located at the Brewery.

**III.    Debt Structure**

21.    The Debtors' primary secured lender is the Huntington National Bank ("HNB"), which has alleged a valid and perfected blanket security interests against all real and personal property of the Debtors as well as non-Debtor guarantors.

22.    Specifically, HNB has alleged that the Debtors are obligated, either as borrowers or guarantors, to HNB in connection with the following loan obligations (collectively, the "Prepetition Obligations"):

    a. A term loan in the original principal amount of $1,350,000.00 dated November 10, 2014, as governed by that certain Business Loan Agreement, together with certain notes, guaranties, mortgages, security agreements, financing statements and other documents and/or instruments executed therewith;

    b. A term loan in the original principal amount of $100,300.00 dated February 25, 2014, together with certain notes, guaranties, mortgages, security agreements, financing statements and other documents and/or instruments executed therewith;

    c. A term loan in the original principal amount of $200,000.00 dated October 4, 2012, together with certain notes, guaranties, mortgages, security agreements, financing statements and other documents and/or instruments executed therewith; and,

    d. A term loan in the original principal amount of $200,000.00 dated November 10, 2014, together with certain notes, guaranties, mortgages, security agreements, financing statements and other documents and/or instruments executed therewith.

23.    With full reservation of all rights of the Debtors to challenge the amount, validity, priority and extent of any lien(s) and/or claim(s) asserted by HNB, HNB alleges that it is owed as of February 28, 2018, the aggregate amount of $1,644,360.69, together with interest, additional late charges, and fees and costs, including attorneys' fees.

24. In addition to the claim(s) of HNB, the Debtors also have allegedly incurred debts allegedly due and owing to three (3) additional lenders: BFS Capital, Funding Circle of USA, Inc., and On Deck Capital (collectively, the "Factoring Lenders").

25. The Debtors suspect that the Factoring Lenders will assert secured claims against the estates, however the Debtors believe that some or all of the claims of the Factoring Lenders will ultimately be deemed to be unsecured, whether by reason of perfection issues, invalidity of the underlying loan agreements, or by virtue of being junior to the claims alleged by HNB once allowed.

### IV. The Cash Management System

26. In order to efficiently and effectively manage its operations, the Debtors have structured their cash management system (the "Cash Management System") to consist of operating and payroll bank accounts, corporate credit cards, and "beer checks" for each location operated by each individual Debtor.

27. The Cash Management System consists of the following bank accounts (collectively, the "Bank Accounts")[2] maintained by HNB:

| Debtor | Bank | Account Name and Location | Account Number |
|---|---|---|---|
| Rivertowne Growth Group, LLC | HNB | Operating – Services, Marketing, General Operating and Office Expenses | *******5384 |
| Rivertowne Growth Group, LLC | HNB | Payroll – RGG Employee Payroll | *******0454 |
| Fybo Management, Inc. | HNB | Operating – RT Verona; RT North Huntington | *******5410 |
| Fybo Management, Inc. | HNB | Payroll – Employees of RT Verona and | *******5423 |

---

2. Rivertowne Growth Group, LLC, has one additional reserve bank account (the "Reserve Account") with First National Bank of Pennsylvania, account number ****2372. As of the Petition Date, the Reserve Account had a balance of $1,761.52. The Debtors do not intend to utilize the Reserve Account and will close the Reserve Account in the ordinary course.

|  |  | RT North Huntington |  |
|---|---|---|---|
| Fybowin, LLC | HNB | Operating – RT North Shore | *******5452 |
| Fybowin, LLC | HNB | Payroll – Employees of RT North Shore | *******5465 |
| Fybomax, Inc. | HNB | Operating RT Monroeville | *******5436 |
| Fybomax, Inc. | HNB | Payroll – Employees of RT Monroeville | *******5449 |
| Fybomax, Inc. | HNB | Operating – Brewery | *******5734 |
| Fybomax, Inc. | HNB | Payroll – Employees of Brewery | *******5747 |

28. All of the accounts maintained by the Debtors are members of the Federal Deposit Insurance Corporation ("FDIC").

29. All of the Debtors' payroll accounts are "ZBA" accounts, meaning the payroll accounts carry a zero dollar ($0.00) balance until payroll comes due. Once payroll comes due, the Debtors transfer the funds necessary to cover payroll from the operating accounts to the payroll accounts for each location. Upon funding the payroll accounts, the funds are disbursed to the Debtors' employees for each pay period.

30. While the Debtors incur monthly banking fees for its use of the Accounts, the Debtors are current on the banking fees as of the commencement of the chapter 11 cases.

31. The Cash Management System also provides for the use of corporate credit cards by the Establishments to purchase and stock liquor to be sold in the ordinary course of the Debtors' operations. The Debtor that operates each Establishment covers the expenses incurred in connection with the purchase and sale of liquor at the respective Establishment using credit cards.

32. Similarly, the Establishments also receive a weekly number of "beer checks," which the Debtors use to purchase beer from an independent, third party distributor as required under Pennsylvania law.

33. Also, the Debtors regularly engage in intercompany transfers in the ordinary course of their respective businesses. In particular, Rivertowne Growth Group provides marketing, equipment, maintenance services, human resources support, and related operating/financial services and accommodations (the "RGG Services") to Fybo Management, Fybomax, and Fybowin, who in exchange pays for the RGG Services in the ordinary course of the Debtors' businesses. The funds paid to Rivertowne Growth Group are used to cover its actual expenses, including, without limitation, the wages of Rivertowne's employees. Notably, all of Rivertowne's employees are W-2 employees with no Rivertowne employee earns more than $65,000 per year.

### V. Employee Compensation and Benefits

34. The Debtors employ approximately 150 employees, of which approximately 61 are full time employees.

35. The employees of Fybo Management, Inc. and Fybowin, LLC historically were paid weekly, while the employees of Fybomax, Inc. and Rivertowne Growth Group were paid bi-weekly. Due to a change in the payroll servicer for Fybo Management and Fybowin, following payment of any outstanding pre-petition employee wages, all employees of the Debtors will be paid bi-weekly going forward using Paycom as the Debtors' sole payroll servicer.

36. The Debtors provide full-time employees with an opportunity to participate in a 401(k) retirement account program and match employee contributions up to four percent (4%). The estimated 401(k) contribution in the aggregate for all Debtors is less than $1,500 per pay.

37. The Debtors also offer full-time employees health insurance, dental, and vision benefits. The estimated contributions for health benefits are less than $12,000 per two-week pay period.

38. Finally, full-time employees can earn up to two (2) weeks paid vacation that accrues throughout the year. To date, the aggregate amount of vacation owed to the employees is approximately 1,040 hours.

39. Due to the timing of the Debtors' filings, a portion of the Debtors' payroll that comes due post-petition relates to pre-petition wages earned by its employees. The Debtors have requested to pay these wages in the ordinary course. I believe it is critical to do so in order to preserve employee morale, the continuity in the workforce, and the enterprise value of the Debtors.

## VI. First Day Motions

40. The Debtors have only filed a limited number of First Day Motions that they believe are necessary to enable them to efficiently administer their estates with minimal disruption and loss of enterprise value. I have reviewed the First Day Motions referenced below and the facts set forth in each are true and correct to the best of my knowledge and I submit that the proposed relief described therein is critical to minimizing disruption within the Debtors' operations and preserving value for the bankruptcy estates and their creditors.

41. The relief sought in the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtors, their employees, customers, vendors, creditors, and other stakeholders. The Debtors have an immediate need to preserve going concern value as well as the confidence of their vendors, customers, and employees.

### a. Emergency Motion for Entry of an Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief

42. The Debtors have filed a motion to jointly administer their bankruptcy cases. The Debtors have done so to reduce the costs associated with administering five cases separately, and advance these cases more efficiently. The Debtors have made disclosures concerning the

enterprise structure as well as how the Debtors interact with one another in the ordinary course. The Debtors operations are not only somewhat integrated but they are likewise interdependent – the restaurant concept largely depends upon the production and sale of the Brewery's craft beers and the Brewery relies upon the restaurants in part for distribution and branding. Given this relationship, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

    **b.    Emergency Motion for Entry of an Order Authorizing Payment of Pre-Petition Wages, Benefits and Withholdings**

43. The Debtors have filed a motion to pay their employees' pre-petition wages, benefits and related withholdings (the "Wages Motion").

44. The Debtors employee approximately 150 employees, approximately 61 of whom are full time employees. I have reviewed the Debtors' Wages Motion and the aggregate amount of pre-petition wages the Debtors seek to pay is $74,350, in addition to accrued and vested benefits (which are relatively small). Based on my review of the Debtors' records and my consultation with counsel, it is my understanding that the amounts sought to be paid in the Wages Motion does not exceed the statutory caps described in section 507(a)(4-5) of the Bankruptcy Code. The relief sought in the Wages Motion is in the best interest of the Debtors' estates as its preserves employee morale, reduces the risk of losing critical members of the Debtors' workforce, and minimizes the risk of a disruption in services, which by extension preserves going concern value.

    **c.    Emergency Motion for Entry of Order (I) Authorizing the Debtors to (A) Continue Operating Their Cash Management System and (B) Continue Intercompany Transactions; and (II) Granting Related Relief**

45. The Debtors seek entry of an order authorizing them to (a) continue operating their cash management system and (b) continue to perform intercompany transactions as they were conducted in the ordinary course of their businesses pre-petition.

46. The Debtors' cash management system enables them to operate multiple locations in an efficient manner. Each location collects both cash and credit card receipts that fund into each Debtors' respective accounts. Moreover, the Debtors use their cash management system in the ordinary course to transfer and distribute funds to various operating and payroll accounts and to facilitate cash monitoring, forecasting, and reporting. Also, the Debtors regularly account for all transfers so that they are accounted for properly – including, in particular, intercompany transfers.

47. The Debtors operations would undoubtedly be interrupted if they were forced to close their existing accounts and open new accounts, especially at a time when disruption of services, and by extension cash flow, would likely delay payment of payroll and post-petition vendor payments. The Debtors have a relatively small management team and a liquidity event is what caused them to seek chapter 11 relief. The diversion of the Debtors' limited resources to close and reestablish a new cash management system at this time, would be likely be disruptive and potentially harmful to their estates. Maintaining the status quo under the circumstances best serves the interests of the estates.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: May 7, 2018

_____
Christian H. Fyke
In his role as an authorized representative of the Debtors